**In re Morton A. GOLDBERG, Debtor.**

**Bankruptcy No. 97–12898–9P1.**

United States Bankruptcy Court,
M.D. Florida,
Ft. Myers Division.

Feb. 26, 1999.

Geoffrey S. Aaronson, Miami, FL, Stanford Solomon, Tampa, FL, for debtor.

Pacific Harbor Capital, Inc., c/o Ronald S. Beacher, New York City.

**ORDER ON MOTION FOR SUMMARY JUDGMENT IN RE OBJECTION TO ALLOWANCE OF CLAIM NO. 19 AND AMENDED CLAIM NO. 29 FILED BY PACIFIC HARBOR CAPITAL, INC.**

ALEXANDER L. PASKAY, Chief Judge.

The matter under consideration in this yet to be confirmed Chapter 11 case of Morton A. Goldberg (Debtor), is the Debtor's objection to the allowance of Claims No. 19 and No. 29 filed by Pacific Harbor Capital, Inc. Successor to PacifiCorp Credit, Inc. (Pacific).

Proof of Claim No. 19 is filed in the amount of "unknown" and is supported by copy of a Second Amended Complaint filed by Pacific in the United States District Court against Barnett Bank, N.A., Morton A. Goldberg, Stephen G. Zahorian, and David T. Fryzel, Civil Case No. 97–416–CIV–FT.M–24. Proof of Claim No. 29 which is an amendment to previously filed Claim No. 19, is also filed in an amount "unknown" and supported by a different copy of a Second Amended Complaint filed by Pacific in the same court against the same defendants.

The supporting documentation attached to both proofs of claim are Complaints originally filed by Pacific in Oregon on February 14, 1997, and later moved to the Ft. Myers Division of the Middle District of Florida. Although the Complaint attached to Proof of Claim No. 19 is entitled "Second Amended Complaint" the Complaint attached to the claim currently under consideration, Claim No. 29 which amends and supersedes Claim No. 19, is also entitled "Second Amended Complaint." All comments in this opinion will relate to the Second Amended Complaint which is attached to Proof of Claim No. 29 (Complaint). The copy of the Complaint attached to Claim No. 29, consists of 241 paragraphs set forth in 77 pages. This Complaint, just like its predecessor is not a role model of a "brief and concise statement of a claim for which relief can be granted" which is a requirement of F.R.Civ.P. 8, which governs pleadings in the Federal Courts. In this Complaint Pacific sought relief against the Debtor only in Count I and Count II.

The immediate matter under consideration is a Motion for Summary Judg-

ment filed by the Debtor who contends that there are no genuine issues of material fact and based on the same, contends that he is entitled to judgment as a matter of law disallowing both claims, with prejudice. According to the Debtor all claims by Pacific against the Debtor have been unconditionally released twice and, in any event, the claims are barred by the Statute of Limitations and, therefore, cannot be allowed as a matter of law. Both Claims 19 and 29 are clearly facially defective because neither of them states an amount claimed. Moreover, both claims are clearly contingent and unliquidated claims, thus cannot be allowed unless the amount is liquidated and the liability determined by virtue of § 502(c) of the Bankruptcy Code. The Debtor does not seek a disallowance of these claims based on the foregoing, but urges that in any event the claims cannot be allowed as a matter of law for reasons discussed and detailed below. Moreover, it is without dispute that Claim No. 19 is superseded by Claim No. 29 there is no serious dispute that Claim No. 19 should be disallowed without further discussion.

This leaves for consideration the Debtor's objection to Claim No. 29 filed by Pacific. In support of its Motion, the Debtor relies on the Affidavit of Jeffrey Rice; the deposition transcripts of the employees of Pacific; the pleadings and documents and admissions filed by Pacific; and also the arguments advanced by Pacific itself at the hearing on the Motion. Pacific filed a 36 page Opposition to the Debtor's Motion for Summary Judgment, which is in fact nothing but a brief and legal argument with citations and authorities.

The relevant facts controlling the issues raised by the Debtor's Motion as appear from the record are, indeed, without substantial dispute and can be summarized as follows:

At the time relevant, the Debtor was a member of the Florida Bar and was the founder and the principal shareholder of the law firm of Goldberg, Rubinstein and Buckley, P.A., located in Ft. Myers, Flori-

da. In 1988 the firm changed its name to Goldberg, Goldstein & Buckley, P.A. (the Law Firm). At all times relevant the Debtor was the president of the Law Firm and, of course, also was an employee and authorized agent of the Law Firm (Motion for Summary Judgment, Exh. A).

The claim of Pacific under consideration has its genesis in the financing of an upscale land development located in Lee County, Florida, owned by a limited partnership known as Fiddlesticks, Ltd. (collectively referred to as Fiddlesticks). The real estate in question had been purchased by Fiddlesticks in 1982 with funds provided by Palmetto Federal Savings & Loan Association (Palmetto). The purchase money loaned by Palmetto was part of an overall $15.8 million loan. Fiddlesticks planned to establish a mixed unit development with two golf courses, 386 single family lots, and common areas devoted to multi-family residential use. One section of the proposed development was named The Highlands Project (Highlands). At the time of the purchase, the property was already encumbered by a first mortgage held by Palmetto that was later assigned to Goldome Savings & Loan Association, (Goldome) which replaced Palmetto as the primary lender to Fiddlesticks. Southeast Bank had also loaned funds to Fiddlesticks and held a second position on the Fiddlesticks development. It appears that around 1987 Pacific indicated an interest to extend credit to Fiddlesticks, with the loan to be secured by a first mortgage lien on the land holdings of Fiddlesticks. On July 9, 1987, Edmund Durante, the Vice President of Pacific, recommended to the senior management of Pacific that Pacific should consider making a $10 million loan to Fiddlesticks secured by the Highlands property. (Doc. No. 304, Deposition of Joseph Barta). Mr. Durante noted that the transaction had risks but it was manageable and the returns would be exceptional if the project was completed as projected. Pacific viewed this loan as an opportunity to penetrate the Southwest Florida real es-

tate market, a market with upward and escalating growth trends.

According to the proposed loan by Pacific, $4.4 million would be used to pay off the Goldome note and mortgage on the Highlands and $1.3 million to pay of the Southeast Bank loan. On July 21, 1987, the loan application submitted by Fiddlesticks was approved for a $10 million facility to be extended by Pacific. The loan transaction was closed on August 19, 1987. The loan had two components, one in the amount of $5.7 million (the Fiddlesticks Term Loan) and one in the maximum amount of $4.3 million (the Fiddlesticks Construction Loan). Pacific's aggregate initial maximum exposure on Fiddlesticks under the loan agreement was $10 million.

The term loan was secured by first and second mortgages on the Highlands and an assignment of golf club memberships. The Fiddlesticks loans were to mature on September 1, 1990, or about 3 years after the initial extension of credit. (See Promissory Note attached as Exhibit C to Loan Agreement.) At closing, 47 separate documents were executed by the parties which, of course, included the promissory notes, mortgages, title insurance documents, personal guaranties, UCC–1 Financing Statements, and opinion letters from the Law Firm, as well as a partial release of mortgage executed by Goldome reflecting on its face a payoff of $2.355 million. (Doc. No. 304, Exh. 11 to Deposition of Joseph Barta).

It is without dispute that the Debtor acted as counsel for Fiddlesticks in connection with the loan transactions and also acted as disbursing agent of the loan proceeds. There is evidence in this record to support the contention of Pacific that it believed that the release price payable to Goldome was $4.4 million. However, unbeknownst to Pacific, on August 11, 1987, prior to the loan closing, Goldome sent a letter to the Law Firm confirming that it would accept $2,355,000 to release its mortgage on the Highlands. This understanding was further confirmed by two additional letters sent by Goldome to the Law Firm. (Proof of Claim No. 29, Exh. E and F to Complaint). However, there is nothing in this record to warrant the finding that Pacific agreed to lend the $10 million only on the condition that $4.4 million would be used to retire the Goldome mortgage. Pacific agreed to extend a $10 million credit facility relying on the Fiddlesticks land as collateral so long as it was assured that it would replace Goldome as the holder of the first mortgage on Fiddlesticks.

There is evidence in this record to show that approximately $1.6 million of the loan proceeds was paid to Fiddlesticks and/or John Santini, the principal of Fiddlesticks, and the Law Firm received approximately $200,000.00 from the loan proceeds.

The employee of Pacific, Joseph Barta (Barta) who was Pacific's account specialist who handled the Fiddlesticks loan during the relevant time, reviewed the closing documents some six months later and, according to his testimony, noticed for the first time the discrepancy between the original payoff number to Goldome and the ultimate amount actually paid to satisfy the Goldome mortgage. (Motion for Summary Judgment, Exh. F). Barta contacted Carl D. Simoni (Simoni), the attorney who represented Pacific in connection with the loan transaction under consideration, and told him about the discrepancy. After the conversation with Simoni, Barta was assured that there was no problem with the discrepancy in the amount of the payoff of the Goldome mortgage.

Thus, it is undisputed that both Pacific and its attorney actually knew that some $1.8 million of the loan proceeds had not been used to pay Goldome but were used for a purpose not intended by the parties, and they gained that knowledge as early as 1988. Notwithstanding, neither Pacific nor its attorney inquired of the Law Firm in 1987 or 1988 what happened to the funds which were supposed to have been paid to Goldome. Nor did Pacific ever

declare a default on the loan documents or seek a recision of the Fiddlestick loan. The fact of the matter is, Pacific actually extended a loan after being aware of the discrepancy discussed earlier, as will be discussed below.

On January 27, 1988, Barnett Bank of Lee County, N.A., (Barnett) entered into a Sale and Participation Agreement with Pacific and purchased a $1 million interest in the Fiddlesticks term loan. The Law Firm also agreed to act as disbursing agent for Pacific for making advances pursuant to the Fiddlesticks construction loan. (Proof of Claim No. 29, Exh. J. to Complaint; Motion for Summary Judgment, Exh. G.).

After closing the Pacific loans, Fiddlesticks commenced the construction of Phase I on The Highlands Project. Unfortunately, due to construction delays, cancellation of presold units and lack of sales, the financial condition of Fiddlesticks was worsening and, in turn, the relationship between Fiddlesticks and Pacific deteriorated. Notwithstanding, Pacific felt completely secured because, according to Pacific, its collateral was worth $9.36 million, which was more than adequate to secure the loan balance of $8.45 million.

The Highlands project continued to struggle and compelled Fiddlesticks to reach the decision to abandon its plans to construct any additional phases. Instead, Fiddlesticks proposed to Pacific to fund a new project entitled Glen Abbey, consisting of single story buildings with no more than four units per building (Doc. No. 304, Exh. 15 to Deposition of Joseph Barta). Pacific agreed to finance the Glen Abbey project. At the time Pacific agreed to finance Glen Abbey, Pacific also learned that there were limited partners involved in the Highland project. In a letter to John Santini, one of the principals of Fiddlesticks, Mr. Barta sent Mr. Santini documents that, according to Barta, were "contrary to your explanation of an informal relationship with outside investors." (Doc.

No. 304, Exh. 16 and 17 to Deposition of Joseph Barta).

## THE FIRST RELEASE

On June 5, 1990, Pacific entered into an Amended and Restated Loan Agreement with Fiddlesticks. This document provided by its own terms that it superseded all loan documents executed in connection with the 1987 loan closing and that the parties agreed that the provisions of the original term loan were no longer in force and effect. The relevant portion of the Amended and Restated Loan Agreement reads as follows:

14.4.2 Effective as of the date hereof, each party hereto, for itself, and on behalf of any person claiming under it, and any of its officers, directors, shareholders, partners, successors in interest, subsidiaries and affiliates, hereby (i) fully, finally and forever releases the other party and all of such other party's Related Parties (as such term is defined below) from any and all Released Obligations (as such term is defined below) and (ii) agrees not to enforce any of the Released Obligations against either the other party or any of such other party's Related Parties. Each party hereto had agreed to this mutual release in partial consideration of the other entering into this Agreement and the other loan Document; . . .

For the purpose of this release, the terms "Related Parties" and "Released Obligations" shall be defined as follows:

(a) *"Related Parties" shall mean any and all present and former officers, directors, shareholders, partners, agents, employees, attorneys, successors in interest, subsidiaries, affiliates, or any other person or entities who may have a right of contribution against any of the preceding persons or entities.*

(emphasis supplied)

(b) "Released Obligations" shall mean any and all claims, counterclaims, debts, defaults, covenants, obligations,

provisions, agreements, liabilities, actions, guarantees, demands, causes of action, rights or interests, whether known or unknown, suspected or unsuspected, vested or contingent, arising between Lender and Borrower prior hereto, in connection with, arising under or related to any Loan Document, or any conversation or negotiations with respect thereto and with respect to any other extension of credit.

(Motion for Summary Judgment, Exh. B.)

Because the Term Loan by Fiddlesticks had been paid down during the initial three-year period, the maximum amount of the 1990 loan was less than the original $10 million maximum provided for by the 1987 loans. The 1990 loans had two components, $4.2 million in the Term Loan, and the Construction Loan with a maximum cap of $5.1 million, or a total of $9.3 million. Barnett continued to participate in the Fiddlesticks loans to the extent of $1 million in the 1990 amended loan.

The 1990 loan documents dealt with the existing security interest originally granted to Pacific in the golf club memberships at the Fiddlesticks Country Club. There is a disagreement as to the legal effect of the treatment of this interest; that is, whether it was a release, or merely affected the priority of the security interest, is disputed and this is not material and controlling of the issues under consideration. It is part of the claim by Pacific that it was one of the elements of a scheme to defraud set forth in its Complaints. It is admitted by Pacific that it knew about this event by late 1991, and this transaction was included in the lawsuit filed by Pacific in 1992 against the Law Firm.

By October 1, 1990, Fiddlesticks was in default under its obligations to Pacific. On July 2, 1991, Pacific filed a suit to foreclose its mortgage and also sued on the loan documents. On October 1, 1991, Pacific obtained a final judgment against Fiddlesticks in the sum of $7,653,155.00. Barnett was still a participant in the Fiddlesticks loans so Pacific Harbor's maximum loss was less than the final judgment amount. Pacific did bid and purchase its collateral at the foreclosure sale and never sought any deficiency judgment against Fiddlesticks.

## SECOND RELEASE

It appears that in late 1991 or early 1992, even before the foreclosure suit was completed, the loan administrator at Pacific, George Bradish (Bradish), who was in charge of the Fiddlesticks loan, expressed the view that David Fryzel (Fryzel), an officer of Barnett Bank, might have engaged in criminal activity in connection with the Fiddlesticks loan. (Doc. No. 304, Deposition of George Bradish). On October 28, 1991, Fryzel stated in a letter that he knew that Fiddlesticks had received some of the so-called diverted money from the Fiddlesticks loan transaction. (Proof of Claim No. 29, Exh. N, Complaint).

In September 1992, Pacific commenced a fraud and conspiracy lawsuit against Fiddlesticks, the Law Firm, the Santini Brothers, and the Banyan Group, Inc., in the United States District Court for the Middle District of Florida. Pacific in its suit (Motion for Summary Judgment, Exh. K) alleged a conspiracy among the defendants, including Harvey Goldberg, the brother of the Debtor, and the Law Firm, to defraud Pacific in connection with the Fiddlesticks loan. Without setting forth verbatim the allegations in the suit filed against the defendants, it shall suffice to note that the gravamen of the charge against the defendants was the claimed fraudulent non-disclosure of the fact that Goldome was willing to accept $2,355,000.00, rather than $4,150,000.00 to release its mortgage, as well as the claim of diverting the difference for a purpose which was not intended and authorized by Pacific prior to the closing.

Pacific, in its Complaint, further charged that the Debtor and the Law Firm disbursed from its trust account to Fiddles-

ticks $1,594,187.60 from the loan proceeds and $200,824.40 to itself, which disbursement was without specific authorization from Pacific. In sum, Pacific alleges in its Complaint that the defendants combined, conspired, confederated, and agreed to perpetrate an organized complex scheme to defraud Pacific by obtaining money through false pretenses or concealment of material facts.

`In November 1992 Robert Puterbaugh, counsel for Barnett, sent a letter to Pacific in which he vigorously protested any insinuation that Barnett and its personnel had been involved in any improper activities and put Pacific on notice that Barnett would not, under any circumstances, join or financially support Pacific in its law suit alleging civil conspiracy, fraud, professional negligence, breach of fiduciary relationship, breach of trust, breach of contract against the defendants named in this suit. (Motion for Summary Judgment, Exh. L.).

On December 8, 1994, Pacific entered into an arms-length settlement of its two-year old litigation releasing the Law Firm, it's employees and its agents. As part of the settlement, Pacific received 1.5 million and Pacific and the Goldberg Law Firm executed a full and final general mutual release. The general release stated:

> The parties, HARVEY B. GOLDBERG, individually, GOLDBERG, RUBINSTEIN & BUCKLEY, P.A., GOLDBERG GOLDSTEIN & BUCKLEY, P.A., and PACIFIC HARBOR CAPITAL, INC., for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, do hereby for themselves, *their agents, employees, affiliates,* divisions (incorporated or unincorporated), subsidiaries, successors, and assigns, jointly and severally remise, release and forever discharge each other, their agents, employees, affiliates, successors, and assigns, of and from all, and all manor of, action and actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, guarantees, indemnifications, promises, liens, variances, damages, judgments, extents, execution, claims, and demands whatsoever, in law and in equity which against them, they, jointly or severally ever had, now have or which their agents, employees, affiliates, divisions (incorporated or unincorporated), subsidiaries, successors, or assigns hereafter can, shall, or may have arising from the claims of, and/or facts alleged in, the civil action styled PACIFIC HARBOR CAPITAL, INC., f/k/a PacifiCorp Credit, Inc. v. Fiddlesticks, Ltd., et al., Case No. 9201372–CIV–T–15C, pending before the United States District Court, Middle District of Florida, Tampa Division.

(Emphasis supplied.)

(Motion for Summary Judgment, Exh. A.)

It appeared that after the execution of this release in 1994, which ostensibly put to bed and resolved all matters concerning the Fiddlesticks loan, the Debtor, his Law Firm and Pacific arrived at peace. Pacific received 1.5 million in cash from the Law Firm's malpractice insurance carrier; foreclosed its mortgage on Fiddlesticks, purchased the development, and is still the owner as far as it appears. It is not unlikely that the property will appreciate, or may have already appreciated, and Pacific could come out of the Fiddlesticks transaction whole.

Unfortunately, the Debtor did not limit his activities to the affairs of the Law Firm or to practice law, he also served on the Board of Directors of Barnett. According to Pacific, the Debtor also played a dominant role in the operation of the Board of Directors of Barnett. It is without dispute that the Debtor became heavily involved in promoting land developments in Lee County. In this connection, he set up several Florida Land Trusts, i.e., Colonial Extension Land Trust; the Eighty–Two

Treeline Land Trust; the South Treeline Land Trust; and the Ninety–Five Six Mile Land Trust. He solicited investors who purchased beneficial interest in these land trusts. Numerous of the investors became disgruntled with the investments and beginning in 1994 sued the Debtor and his Law Firm in the Circuit Court in and for Lee County, Florida, alleging that they suffered injuries as a result of the fraudulent representations made in connection with the solicitation of their investments.

As noted earlier, the original litigation filed by Pacific against the Debtor, Barnett, Zahorian and Fryzel was commenced in the U.S. District Court in Oregon on February 14, 1997, and was transferred to the U.S. District Court, Ft. Myers Division, Middle District of Florida on August 20, 1997. The claims asserted in the Complaint basically alleged violation of the provisions of the Racketeering Influenced and Corrupt Organization (RICO) Act, 18 U.S.C. § 1962. This Complaint charged five predicate acts as basis for the RICO violation. In the First Count of the Complaint, the Debtor was charged with violation of RICO, 18 U.S.C. § 1962(c), based on alleged land fraud schemes and money laundering carried on through a criminal enterprise in which he, together with Barnett Bank and its officers, Zahorian and Fryzel, and other non-party co-conspirators (referred to as the Barnett–Goldberg Group) were participants. None of these fraudulent land schemes, with the exception of the Fiddlesticks loan transaction, involved Pacific at all. The specific racketeering activities are described on Pages 67 through 72 of the Complaint (Proof of Claim No. 29, Page 67 of Complaint) and Pacific charged numerous and sundry acts without specificity which the participants in this alleged "criminal enterprise" had committed. Be that as it may, it is clear that all the alleged criminal conduct of this "criminal enterprise" as far as the Debtor is concerned is limited to the Fiddlesticks loan transaction. In its Complaint, Pacific demanded judgment against the Defendants Barnett Bank, Morton Goldberg, Za-

horian and Fryzel on its First Count for Relief for all "damages sustained by Plaintiff including, but not limited to, compensatory damages, consequential and incidental damages, punitive damages, together with pre and post-judgment interest, reasonable attorneys' fees, experts' fees, costs of investigation and litigation, and such other and further relief as this Court deems just and proper." (Proof of Claim No. 29, Page 72 of Complaint.)

In its Second Count for Relief, Pacific charged violation of RICO: 18 U.S. § 1926(d) of racketeering activities by Barnett Bank, Morton Goldberg, Zahorian and Fryzel and again sought the same relief as recited in the previous paragraph.

The Third and Fourth Counts set forth claims of breach of contract against Barnett Bank only. The Fifth Count is a claim of common law fraud against Barnett Bank and Fryzel against Barnett Bank and Fryzel.

In the meantime, the ongoing criminal investigation by the Federal Government of the several land deals orchestrated by the Debtor culminated in a two count indictment handed down by the grand jury charging the Debtor with one count of mail fraud and one count of money laundering.

On November 20, 1995, the Debtor pled guilty in Federal District Court to one count of mail fraud and one count of money laundering. The mail fraud count involved the Debtor's activities in obtaining secret profits as a result of the real estate transactions. The money laundering count was based on the Debtor's admitted embezzlement from the Law Firm of what he acknowledged at that time was in excess of $1 million, which ultimately turned out to be in excess of $2.1 million.

On April 19, 1996, the Debtor was sentenced for not less than 51 and not more than 63 months to be incarcerated in a Federal Correctional Institution and he is still in custody serving his sentence. He was also required to make restitution to

the investors involved in certain land trusts, i.e. Colonial Extension Land Trust; the Eighty–Two Treeline Land Trust; the South Treeline Land Trust; and the Ninety–Five Six Mile Land Trust, in the amount of $2,882,696.00. In this connection, it should be noted, again, that Pacific was not involved at all in the money laundering count and neither was it involved in the count which charged mail fraud.

Even a cursory reading of the documentation of either the Proof of Claim No. 19 or Proof of Claim No. 29, Exhibits A – Q attached to the Complaint clearly indicate that all the documents relate to the Fiddlesticks loan transaction and the Highlands project. The Complaint attached to Proof of Claim No. 29, unlike the first Second Amended Complaint, omits all the various and sundry charges of drug smuggling, illegal gambling, and physical intimidation.

Nevertheless, it is clear that the Debtor was an indispensable player in the alleged criminal enterprise the basis to support the RICO violation against Barnett and its officers because according to the exhibit attached to the proof of claim, Pacific was not involved in any of the alleged fraudulent land schemes and the other multitude of criminal conduct charged against Barnett and its officers. This record leaves no doubt and it is beyond peradventure that Pacific's interest and involvement was limited to the Fiddlesticks loan and never had any connection with or interest in any other alleged racketeering activity of this Debtor and Barnett and its officers charged in the RICO complaint. In sum, it is clear from the foregoing that without the Debtor as a prime player in the conspiracy, Pacific has no underpinning of its RICO claim against the Defendants because without the Defendants there would not be a link in the chain and the underpinning of the RICO claim would be nonexistent and there would be no basis to maintain a viable RICO claim against the other Defendants.

## PACIFIC HARBOR'S CONTENTION IN SUPPORT OF ITS CLAIM AGAINST THE DEBTOR

■ Pacific contends that this record is replete with serious disputed facts which, of course, would preclude a disposition of the issues under consideration by summary judgment. Pacific admits, as it must, that the documentary evidence which is part of this record, is clearly undisputed but contends that they are inconsequential. In order to prevail on its contention that the releases relied on by the Debtor did not release this Debtor, one must accept the proposition that the Debtor, in fact, had a triple-personality. In one he acted as the President of the Law Firm, the other as an individual attorney not connected with the Law Firm, and a third as a member of the Board of Directors of Barnett as an entrepreneur involved in large scale land development schemes. For instance, Pacific contends that the first release did release the Debtor and his Law Firm in connection with the Fiddlesticks loan, but did not release the Debtor from any RICO claim against him because, according to Pacific, at the time it executed the first release it did not know the subsequent events which formed the predicate acts which were necessary to establish the existence of a criminal enterprise and, in turn, a RICO violation. In support of this proposition, Pacific points out that the first time it became aware of the existence of the criminal enterprise is when the disgruntled investors involved in the several land schemes orchestrated by the Debtor, filed their lawsuits and when it also became known that there was an ongoing Federal investigation against the Debtor. Pacific admits, as it must, that it was fully aware of all the relevant facts surrounding the Fiddlesticks loan when it executed the release. The fact that it was not aware that these facts may ultimately later also may form the basis of a predicate act in connection with an ongoing criminal investigation in which the Debtor, Barnett, and others that participated, which transaction

Pacific was not involved in at all, is of no consequence. It would, indeed, be an ingenious attempt to parse the interpretation of the term "release" and would be nothing but sheer sophistry to argue that Pacific did not intend to release the Debtor and his Law Firm of any and all matters which surrounded and related to the Fiddlesticks loan and of any claim which may be arise later on a different legal theory based on the very same facts which were relevant to the Fiddlesticks loan transaction.

In the second release, Pacific contends that it did not release the Debtor individually, because it only sued the Law Firm and not the Debtor individually. While it might be argued that the fact that the Debtor was not named individually in the lawsuit that the release did not release the Debtor, it is without dispute that the Law Firm was named as a defendant; that the Debtor was its President and principal of the Law Firm and the release released all the Law Firm's *agents, employees,* and *affiliates* unconditionally from any claims of any sort of any kind, jointly and severally, which Pacific ever had, then had, or which their agents, employees, may in the future have arising from the Fiddlesticks transaction. The fact that the Debtor, individually, was not named in the second release is without significance because it is without dispute that he was clearly involved in the lawsuit as an employee of the Law Firm and he actually signed the general release as the Law Firm's representative. Any attempt by Pacific to escape the effect of this release by claiming that at that time he did not know that the Debtor was the "benevolent Dictator" principal shareholder and "founder" and senior partner of the Law Firm, is of no consequence. Even assuming that the characterization of the Debtor as a benevolent dictator is true, this has absolutely no legal effect and impact on the legal validity of the second release.

## STATUTE OF LIMITATIONS

■ It is without dispute that very shortly after the closing of the Fiddlesticks transaction, the employees of Pacific knew that the release price for the Goldome mortgage was not $4.4 million, but that Goldome agreed to accept $2.355 for the release of the mortgage on Highlands. The attorney for Pacific was apparently satisfied, and voiced no objection and Pacific did not become disturbed about the Fiddlesticks transaction until after extending a new loan and then suing the Law Firm. It certainly ill behooves Pacific to contend that it was not aware and did not become aware until shortly after the closing of the alleged diversion of funds which after the closing were not funds of Pacific at all, but funds of the borrower. There is no evidence in this record that this so-called diversion of funds did negatively impact the economic interest of Pacific who relied as security for its loan, its first mortgage position on the land and the so-called assignment of the club memberships. When Fiddlesticks defaulted in 1990, Pacific thereafter filed a foreclosure action in July 1991 and obtained a Final Judgment in October 1991 in the amount of $7,653,155 against Fiddlesticks. In September 1992 Pacific sued the Law Firm and named Harvey Goldberg as Defendant, asserting again a conspiracy and numerous wrongdoings. It was this lawsuit that was settled with Pacific receiving in excess of $1.5 million from the Law Firm's insurance carrier, and from which came the second release in 1994.

To bootstrap now the Fiddlesticks claim into predicate acts to support a RICO claim is reaching too far. First, Pacific learned as early as 1988 that the amount paid to Goldome to satisfy the Goldome mortgage was less than originally stated (Doc. No. 304, Deposition of Joseph Barta). Second, Pacific's contention that the alleged failure to disclose unnamed investors in Fiddlesticks is of no consequence and has no material bearing on the willingness of Pacific to grant a $10 million loan

to Fiddlesticks. Third, notwithstanding the foregoing, Pacific renewed and rewrote the original loan agreement and in connection with the execution of those documents, as noted, earlier, released any and all claims it had against the Debtor in connection with the Fiddlesticks loan transaction.

It is apparent from the foregoing that the claim filed by Pacific in this Chapter 11 case, either the original Claim No. 19 or the amended Claim No. 29, is based solely on the Debtor's involvement in the Fiddlesticks transaction, for which transaction Pacific released any and all claims against the Law Firm, including the Debtor, not once, but twice. In addition, the Complaint filed against the Debtor in the District Court based on the civil RICO violation is of no consequence because the underlying facts which are alleged in the Complaint, i.e., the concealment of the amount of the payoff of the Goldome mortgage in the Fiddlesticks transaction, was known to Pacific since at least 1990. Therefore, any claims are barred by the Statute of Limitation.

One would be less than candid not to admit that this is a complex and factually convoluted saga involving this particular Debtor beginning with the Fiddlesticks loan and culminating ultimately in his criminal conviction and incarceration. However, based on a close analysis of the facts relevant to the claims asserted against this Debtor and not against Barnett or its officer, it is crystal clear that there are no genuine issues of material fact and Pacific has no valid enforceable claim against this Debtor. First, because whatever claim it had against the Debtor was released twice. Second, whatever claim it has against the Debtor is barred by the applicable Statute of Limitations. Lastly, even as a matter of bankruptcy law, the claim as filed cannot be allowed for any purpose in this Chapter 11 case simply because Claim No. 29, which superseded Claim No. 19, states no amount and states no basis or documentation which would make any claim at this time a legally enforceable allowable claim under Section 502 of the Bankruptcy code against this Chapter 11 estate.

Having said all this, this Court is satisfied that the Motion for Summary Judgment filed by the Debtor should be granted and, therefore, both its claims, No. 19 as superseded by Claim No. 29, should be disallowed with prejudice.

ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment filed by the Debtor be, and the same is hereby, granted and Claims No. 19 and 29, filed by Pacific, be and the same are hereby disallowed, with prejudice.